# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN SMITH, | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No. 4:10-CV-2133** |
| | : | |
| v. | : | **(Judge Rambo)** |
| | : | |
| JANINE DONATE, et al., | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.   Statement of Facts and of the Case

This case, which comes before the court for consideration of a motion for summary judgment, (Doc. 102), presents starkly divergent factual narratives, punctuated by isolated instances of consensus, set against the backdrop of physical confrontations in a county prison.

### A.   Smith's Narrative

The plaintiff, Alan Smith, is a state prisoner and *pro se* litigant who has filed a detailed 224-paragraph civil complaint against various correctional defendants at the Lackawanna County Prison arising out of a series of incidents spanning from November 19, 2008, through January, 2009. (Doc. 1.) With respect to these incidents, Smith presents a factual narrative in his complaint, and pleadings, which describes an on-going pattern of staff misconduct. (Docs. 1 and 124-128.) According to Smith's narrative, the plaintiff first arrived at the prison on November 19, 2008, as a prisoner

brought by writ to appear and testify before a state grand jury. (Id.) At the time Smith arrived at the county prison, one other inmate had also been brought in as a grand jury witness, and correctional staff were speculating that the inmates were scheduled to appear and testify as part of an investigation into staff misconduct at the prison. (Id.) Indeed, Smith alleges that the correctional defendants specifically and repeatedly questioned him regarding whether he intended to testify about past staff misdeeds at the prison. (Id.)

Smith further alleges that individual staff defendants, including defendant Correctional Officers Capone, Blume, Talutto and Mallick, promptly placed him in physical jeopardy, by threatening him with violence, by speculating regarding his grand jury appearance, and by identifying Smith to other inmates as a previously convicted sex offender. (Id. ¶¶4-7.) Shortly after Smith was labeled in this fashion by the defendants, on November 20, 2008,  he contends that fellow inmates sprayed a caustic cleaning substance in his eyes causing Smith great pain. (Id. ¶27.) Smith requested medical assistance at  approximately 5:30 p.m. on November 20, but was only transported to receive care four and one half  hours later, at approximately, 9:30 p.m. on November 20, 2008.  (Id.¶¶35-36.) According to Smith, when he was finally transported to be seen by medical staff, he was treated roughly by correctional defendants Moskwa and Talutto, who he alleges needlessly inflicted pain upon him

when handcuffing him, and then groped his genitals. (<u>Id</u>.¶¶37-42.) Upon being returned to his cell, Smith discovered that the cell had been defaced with urine and feces, and learned that the water to the cell had been turned off, allegedly on the orders of defendant Chiarelli. (<u>Id</u>.¶52.) Smith complained, and water service was restored to his cell after a brief delay in the early morning hours of November 21, 2008. (Id. ¶54-55)

On November 21, 2008, Smith alleges that this staff abuse escalated dramatically when the correctional staff defendants Shanley, Blume and Mallick allegedly beat and assaulted the plaintiff in the course of a cell extraction. (<u>Id</u>., ¶¶60-96.) As staff assaulted him, Smith alleges that one correctional defendant, Correctional Officer Zemantauski, stood by and refused to intervene. (<u>Id</u>. ¶90.) Smith also alleges that additional correctional defendants, including Lieutenant Carrol, the senior supervisor in the scene, intentionally failed to record the cell extraction, or photograph and otherwise document the extent of his injuries. Indeed, when he requested that steps be taken to document the assault, Smith alleges that defendants, including defendant Lieutenant Carrol, refused his requests. (<u>Id</u>.¶97-98.)

Smith contends that he was then transferred to a psychiatric observation cell for several days, where he was kept under observation and received limited amenities. (<u>Id</u>., ¶¶ 110-135.) According to Smith he remained housed in this observation cell beyond the time period prescribed by the prison psychiatrist. However, notably absent

from Smith's pleadings are any well-pleaded allegations attributing this conduct to specific named defendants during the period when he was housed in this observation cell.[1]

Upon his release from the psychiatric observation cell, Smith, alleges that he was brought before two hearing officers, defendants Maloney and Hebron, and was informed that he had been cited for misconduct. (Id. ¶¶133-137.) Smith claims that he protested the disciplinary citation, stating that he had not received any documentation relating to this alleged misconduct, had no notice of the hearing, and had no opportunity to prepare a response to the misconduct citation or call witnesses. (Id.) Smith alleges that he sought a continuance, which was denied, and then was found guilty of the disciplinary infraction, and was sentenced to 100 days of disciplinary confinement. (Id.) According to Smith, the response to his due process concerns was "that they do what they want at this prison and the Plaintiff should know this by now." (Id., ¶137.)

Smith then alleges that, for four days from November 26, 2008 through November 30, 2008, he was denied proper bedding, food trays, clothing and hygiene

---

[1] In this regard, Smith simply notes that defendant Mallick placed him in the cell on or about November 22, 2008 (Id., ¶116), and later removed him from the cell on or about November 26, 2008. (Id., ¶130.) He does not allege that Mallick, or any other named defendant, was personally responsible for the alleged deprivations he experienced in the observation cell, instead attributing these deprivations to unnamed inmates and RHU staff. (Id., ¶¶110-135.)

materials. (Id., ¶139.) With respect to these claims, Smith describes his conditions of confinement in very general terms and identifies only two named defendants, defendants Kearney and Mallick, who had any involvement in these custodial matters. Furthermore, Smith's averments as to these defendants are sparse. According to Smith, defendant Mallick failed to deliver one meal tray, (id. ¶143), and defendant Kearney allegedly once responded to Smith's complaints regarding his conditions of confinement by stating that he had been ordered to give Smith nothing while he was housed in the prison. (Id., ¶141.)

On the basis of these allegations Smith has sued the correctional officers that he claims mistreated him during the course of this cell extraction and at other times, as well as supervisors that he claims acquiesced in these action, and one correctional officer who failed to intervene when Smith alleges that he was assaulted by staff, asserting that all of these defendants violated Smith's rights under the Eighth Amendment to be free from cruel and unusual punishment. Smith further contends that defendants Maloney and Hebron, the prison hearing examiners, denied him his due process rights in the course of the disciplinary hearing which followed this cell extraction.

## B.    The Defendants' Rejoinder

These correctional defendants, in turn, describe Smith's brief incarceration at the Lackawanna County Prison in starkly different terms, categorically denying all of Smith's factual averments, and instead insisting that they responded in a measured and appropriate way to misconduct by the plaintiff, a truculent and mentally unbalanced inmate who refused to comply with staff instructions and became physically violent and self destructive when they endeavored to compel his compliance with prison rules. (Doc. 102-105.) In response to what they characterize as unprovoked inmate violence, the correctional defendants then describe a measured and appropriate use of discrete physical force. (Id.)

Yet, even while the defendants present this contrasting and irreconcilable account of these events, there are factual disputes among and between the defendants on certain matters which may be material to Smith's claims. For example, with respect to a pivotal aspect of Smith's excessive force claim, the November 21, 2008 cell extraction incident at the prison, the defendants have tendered a contemporaneous declaration written by Lt. Carrol, the senior correctional supervisor  on the scene. (Doc. 104, Ex. J.)This declaration conflicts in some respects with the overall claims of the defense, and adds credence to at least some of Smith's assertions.  In this declaration, Carrol states that she specifically instructed Sgt. Shanley and the cell

extraction team to wait until the video camera was prepared before conducting the cell extraction, and reports that the cell extraction team did not follow her instructions. (Id.) These admissions by Carrol create factual questions concerning whether the cell extraction team deliberately chose to conduct this procedure off- camera, as Smith has alleged.  Carrol then describes  unprofessional and mutually acrimonious exchanges between herself and Sgt. Shanley, exchanges in which each supervisor appears to blame the other for the manner in which the cell extraction was conducted, an angry exchange which may permit an inference that this cell extraction was not performed properly. (Id.)  Furthermore, Carrol's own account of her actions at the scene lends credence to Smith's claim that Carrol–the senior supervisor on site–abdicated her responsibilities to him. Specifically, Lt. Carrol states in this report that when she arrived at the scene of the cell extraction and found that her instructions had not been followed she "informed the officers to handle what ever they had started I was not getting involved." (Id.)

Thus, the factual record in this case is marked by sharply defined conflicts between Smith and the defendants, and is further shrouded by internal conflicts and contradictions between and among the defendants relating to various potentially material facts. These starkly drawn legal and factual disputes are now presented to the court in the context of the defendants' motion for summary judgment, which seeks dismissal of all claims lodged by Smith against all parties. (Doc. 102.)  This motion

has been fully briefed by the parties, (Docs. 102-105, 129-132), and is now ripe for resolution.

For the reasons set forth below, it is recommended that this motion for summary judgment be granted, in part, and denied, in part.

## II.   Discussion

### A.   Rule 56–The Legal Standard.

The defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the

light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub.</u>
<u>Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to
disputed material issues of fact must show by competent evidence that such factual
disputes exist. Further, "only evidence which is admissible at trial may be considered
in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers</u>
<u>Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force
to parties who attempt to rely upon hearsay statements to establish material issues of
fact which would preclude summary judgment. With respect to such claims, it is well-
settled that: "In this circuit, hearsay statements can be considered on a motion for
summary judgment [only] if they are capable of admission at trial." <u>Shelton v.</u>
<u>University of Medicine & Dentistry of N.J.</u>, 223 F.3d 220, 223, n.2 (3d Cir. 2000),
citing <u>Stelwagon Mfg. v. Tarmac Roofing Sys., Inc.</u>, 63 F.3d 1267, 1275, n.17 (3d
Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a
> court may only consider evidence which is admissible at trial, and that a
> party can not rely on hearsay evidence when opposing a motion for
> summary judgment. See <u>Buttice v. G.D. Searle & Co.</u>, 938 F.Supp. 561
> (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection
> by demonstrating that the material would be admissible at trial under an
> exception to hearsay rule, or that the material is not hearsay. See <u>Burgess</u>
> <u>v. Allstate Ins. Co.</u>, 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere
> possibility that a hearsay statement will be admissible at trial, does not
> permit its consideration at the summary judgment stage. <u>Henry v.</u>
> <u>Colonial Baking Co. of Dothan</u>, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely

upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Yet, while "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment," <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995), and "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions," <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985), the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007). Therefore, in a case where the parties' pleadings reveal disputes regarding the admissibility of specific evidence, the principles governing consideration of summary judgment motions –which enjoin us to examine the evidence in a light most favorable to the party opposing the motion–also call upon us to resolve all genuine disputes concerning the admissibility of specific items of evidence in favor of the party opposing the motion. This principle applies with particular force to factual disputes which relate to matters of motive or intent. In this regard, it is well-settled that: "The motive or absence of motive of a party to engage in conduct alleged by another party is relevant to determining whether a genuine issue of fact exists. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 596 (1986)." <u>Berda v. CBS Inc.</u>, 800 F.Supp. 1272, 1276 (W.D.Pa), <u>aff'd.</u>, 975 F.2d 1548 (3d Cir. 1992).

### B. Constitutional Standards Governing Eighth Amendment Claims.

In conducting this legal analysis we must also be mindful of the constitutional standards which govern Eighth Amendment claims, since Smith advances a panoply of Eighth Amendment claims against various defendants in his complaint. Indeed, in our assessment of the complaint, Smith alleges, with varying degrees of clarity, at least five different constitutional claims under the Eighth Amendment, asserting at various times that prison staff violated his Eighth Amendment rights by: (1) using excessive force against him; (2) failing to intervene in the use of excessive force by others; (3) failing to protect Smith from inmate assaultive violence and promoting such violence by labeling Smith as a child molester and a cooperating witness; (4) displaying deliberate indifference to Smith's medical needs; and (5) failing to provide Smith with conditions of confinement which met the minimal civilized measure of life's necessities.   Each of these Eighth Amendment claims is, in turn, judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction. All of the various claims, however, are governed by the same overarching and animating constitutional benchmarks. As the United States Court of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment

scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000)

With these tenets in mind we turn to a consideration of the individual Eighth Amendment claims advanced here by Smith.

### 1.   **Excessive Force Claims**

Eighth Amendment excessive force claims entail a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments

Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Since the keystone to analysis of an Eighth Amendment excessive force claim entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, Hudson v. McMillian, 503 U.S. 1, 6-7 (1992)–excessive force claims often turn on factual disputes which cannot be resolved as a matter of law. As the United States Court of Appeals for the Third Circuit has aptly observed:

> [T]he Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified. See Whitley v. Albers, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In an excessive force claim, the central question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Summary judgment in favor of a defendant is not appropriate if "it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Whitley, 475 U.S. at 322, 106 S.Ct. 1078; see also Sampley v. Ruettgers, 704 F.2d 491, 495 (10th Cir.1983) (holding that wantonness exists when a prison guard intends to harm an inmate).
>
> Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).

Consistent with this fact-bound approach to litigation of these claims, there are several factual considerations that a court must examine in determining whether a correctional

officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

## 2.   Failure to Intervene Claims

In addition to Eighth Amendment excessive force claims, courts recognize a closely related Eighth Amendment cause of action based upon a failure to intervene

when other correctional staff use excessive force, although the contours and parameters of this claim are carefully circumscribed. Thus, the United States Court of Appeals for the Third Circuit considered the question of whether a prison corrections officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior in Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002). Upon consideration of that issue, the Third Circuit held "that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." Id. at 650. In addition, the appeals court held "that a corrections officer can not escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers." Id.

In reaching this holding, the court took care to explain that "the duty to uphold the law does not turn upon an officer's rank . . . [and] is neither affected by, nor proportional to, a non-intervening officer's relationship to an offending colleague." Id. at 651. The court emphasized the reason for its conclusion, and expressed its substantial concern with the failure of a police or corrections officer to intervene to prevent excessive force, as follows:

> The approving silence emanating from the officer who stands by and watches as other unleash an unjustified assault contributes to the actual use of excessive force, and we cannot ignore the tacit support such

silence lends to those who are actually striking the blows.  Such silence
is an endorsement of the constitutional violation resulting from the illegal
use of force.  It is incompatible with the restrictions imposed under the
Eighth Amendment, and is therefore unacceptable.  We will not
immunize such conduct by suggesting that an officer can silently
contribute to such a constitutional violation and escape responsibility for
it.  The restriction on cruel and unusual punishment contained in the
Eighth Amendment reaches non-intervention just as readily as it reaches
the more demonstrable brutality of those who unjustifiably and
excessively employ fists, boots or clubs.

Id. (footnote omitted)

In announcing this holding, the appeals court acknowledged that its prior case
law addressing the issue of a failure to intervene involved police officers, rather than
corrections officers acting, or failing to act, within the confines of a prison.  Id.
However, given the specific legal duties imposed on correctional staff, the court held
that this distinction was did not affect the court's analysis:

Both are law enforcement officers, both are sworn to uphold the law, and
both are authorized to use force (even deadly force) toward that end.  We
are, of course, aware of the obvious security concerns inside the close
confines of a prison.  However, that is simply one factor that must be
considered in determining if a particular application of force is
reasonable. It does not suggest a different Eighth Amendment inquiry for
corrections officers as opposed to police officers.  The law does not
allow either to condone or cover up the use of excessive force.  Similarly,
neither can escape liability by turning either a blind eye or deaf ear to the
illegal conduct of their colleagues.

Id. at 651-52.

Thus, Smith held that corrections officers may be liable under § 1983 for failing
to intervene in an instance of excessive force if they had a reasonable opportunity to

do so.  Moreover, the court held that "neither rank nor supervisory status is a factor in assessing whether [a corrections officer] had 'a realistic opportunity to intervene.'" Id. at 652 (quoting Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000)). Accordingly, following Smith the Eighth Amendment is implicated only in a narrow class of failure-to-intervene claims. To state a valid cause of action "in a case where an inmate claims an officer had a duty to take reasonable steps to protect a victim from another officer's use of excessive force, the inmate must prove that (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir.2002)." Knauss v. Shannon, CIV. 1:CV-08-1698, 2010 WL 569829 (M.D. Pa. Feb. 12, 2010). "Additionally, it is plaintiff's burden to adduce evidence of [these] requirements. Gainor v. Douglas County, Ga., 59 F.Supp.2d 1259, 1289 (N.D.Ga.1998) ('plaintiff must proffer evidence that the officer in question had a reasonable opportunity to intervene.')." Yarnall v. Mendez, 509 F. Supp. 2d 421, 433 (D. Del. 2007).

### 3.      Failure to Protect Claims

Courts also recognize that prison officials have an affirmative obligation to protect inmates from abuse at the hands of fellow prisoners. However, as is the case generally with Eighth Amendment claims, proof of a culpable subjective intent is a critical component of an Eighth Amendment failure-to-protect claim. The leading case in the Third Circuit addressing deliberate indifference in this prison context is found

in <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001). In <u>Beers-Capitol,</u> the Third

Circuit explained the basic requirements of a claim brought against a prison official

under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

<u>Id.</u> at 125 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)).  Furthermore, in

cases involving prison safety or prison conditions, the relevant state of mind "is one

of 'deliberate indifference' to inmate health or safety."  <u>Id.</u>

This deliberate indifference standard "is a subjective standard under <u>Farmer</u> –

the prison official-defendant must actually have known or been aware of the excessive

risk to inmate safety."  <u>Id.</u>  Thus, " '[d]eliberate indifference can be shown when a

prison official *knows of and disregards* an excessive risk to inmate health or safety'

<u>Hamilton v. Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997) (quotation marks

omitted)(emphasis added). Accordingly, "to survive summary judgment on an Eighth

Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce

sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants'

deliberate indifference to that risk; and (3) causation." <u>Davis v. Williams</u>, 354 F.

App'x 603, 605-606 (3d Cir. 2009).

As explained in Beers-Capitol, in Eighth Amendment cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known."   Id. at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'"   Id. (quoting Farmer, 511 U.S. at 837).   This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"   Id. (quoting Farmer, 511 U.S. at 837).

At the same time, this subjective standard does not insulate officials from liability where such officials choose to remain deliberately indifferent to an excessive or substantial or serious risk of harm to inmates.   The Supreme Court explained:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates.   Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Farmer, 511 U.S. at 842.  The Supreme Court also noted that a supervisory defendant's knowledge of a risk may be proved through circumstantial evidence, so that "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id.

The appellate courts recognize that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim. See, e.g, Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005). Instead, the Court of Appeals has interpreted Farmer to signal that a plaintiff could make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation. However, in order to show deliberate indifference in this fashion, a plaintiff would need to come forward with evidence showing a substantial basis for demonstrating that a prison official was deliberately indifferent in the face of information that presented a substantial risk to inmate safety. As the Supreme Court has observed in this context: "If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was *longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,* and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk *and thus must have known about it*, then such evidence would permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Farmer, 511 U.S. at 842-43 (emphasis added).

-22-

**4.    Eighth Amendment Deliberate Indifference Claims in a Prison Medical Context.**

Prison officials may also violate an inmate's rights under the Eighth Amendment to the United States Constitution by displaying "deliberate indifference" to this inmate's medical needs. To sustain such a claim, an inmate must plead facts which:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 105 (1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, an inmate is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier,

182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional

judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue

delay in receiving treatment and, as the district court noted, the evidence
he presented established that he received timely care . . . . Although [an
inmate plaintiff] may have preferred a different course of treatment, [t]his
preference alone cannot establish deliberate indifference as such second-
guessing is not the province of the courts.

James, 230 F.App'x. at 197-198.(citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-guess the

propriety or adequacy of a particular course of treatment is disavowed by courts since

such determinations remain a question of sound professional judgment. Inmates of

Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring

v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).

There is a necessary corollary to this principle, limiting the reach of the Eighth

Amendment in a prison medical setting. In a case such as this, where the plaintiff's

complaint reflects that an inmate received some level of on-going medical care, it is

also well-established that non-medical correctional staff may not be "considered

deliberately indifferent simply because they failed to respond directly to the medical

complaints of a prisoner who was already being treated by the prison doctor." Durmer

v. O'Carroll, 991 F.2d 64, 69 (3d. Cir. 1993). The rationale for this rule has been aptly

explained by the United States Court of Appeals for the Third Circuit in the following

terms:

If a prisoner is under the care of medical experts . . . , a non-medical
prison official will generally be justified in believing that the prisoner is

in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference

Spruill v. Gillis, 372 F.3d 218, 236 (3d. Cir. 2004).

Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims.  See, e.g., Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill v. Gillis, supra; Durmer v. O'Connor, supra; Garvey v. Martinez, No. 08-2217, 2010 WL 569852 (M.D. Pa. Feb. 11, 2010); Hodge v. United States. No. 06-1622, 2007 WL 2571938 (M.D. Pa. Aug. 31, 2007).

### 5.    Conditions of Confinement Claims

The same guiding principles apply to inmate complaints regarding their conditions of confident. "When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with 'deliberate indifference' to the inmate's health. Farmer v. Brennan, 511 U.S. 825,

837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The objective inquiry is whether the

inmate was 'denied the minimal civilized measure of life's necessities.' <u>Hudson</u>, 503

U.S. at 9, 112 S.Ct. 995."<u>Fuentes v. Wagner</u>, 206 F.3d 335, 345 (3d Cir. 2000). In this

setting, it is clear that:

> The Eighth Amendment prohibits punishments inconsistent with
> "evolving standards of decency that mark the progress of a maturing
> society." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d
> 251 (1976) (quoting <u>Trop v. Dulles</u>, 356 U.S. 86, 101, 78 S.Ct. 590, 2
> L.Ed.2d 630 (1958)). Conditions of prison confinement violate the
> Eighth Amendment only if they "deprive inmates of the minimal civilized
> measure of life's necessities." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347,
> 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)

<u>Atkinson v. Taylor</u>, 316 F.3d 257, 272 (3d Cir. 2003).

Thus, these claims also require proof of a both culpable state of mind, and objective

proof of physical conditions of confinement which shock the conscious and depart

from minimal civilized standards of life's necessities.


### C.   <u>Disputed Issues of Fact Preclude Summary Judgment on Smith's Excessive Force and Failure to Intervene Claims</u>.

#### 1.   <u>Cell Extraction Claims</u>

Judged against these standards, we find that genuine disputes of material fact

preclude summary judgment in favor of the defendant correctional officers who

allegedly used excessive force against Smith. For example, with respect to defendants

Shanley, Blume and Mallick, thee members of the cell extraction team named by

Smith for their roles in removing him from his cell on November 21, 2008, the record is replete with sharply drawn disputes relating to material facts concerning the nature of the encounter between Smith and the officers; the degree of force employed in the encounter; the identity of the aggressors in the encounter; and the subjective motivations of the officers as they employed force against Smith. These unresolved, and factual questions are further highlighted by the internal inconsistencies in some of the defendants' accounts of this episode, specifically a contemporaneous declaration written by Lt. Carrol, the senior correctional supervisor on the scene. (Doc. 104, Ex. J.)This declaration conflicts in some respects with the overall claims of the defense, and adds credence to at least some of Smith's assertions. In this declaration, Carrol states that she specifically instructed Sgt. Shanley and the cell extraction team to wait until the video camera was prepared before conducting the cell extraction, and reports that the cell extraction team did not follow her instructions. (Id.) These admissions by Carrol create factual questions concerning whether the cell extraction team deliberately chose to conduct this procedure off camera, as Smith has alleged. Carrol then describes unprofessional and mutually acrimonious exchanges between herself and Sgt. Shanley, exchanges in which each supervisor appears to blame the other for the manner in which the cell extraction was conducted, an angry exchange which may permit an inference that this cell extraction was not performed properly. (Id.) Furthermore, Carrol's own account of her actions at the scene lends

credence to Smith's claim that Carrol–the senior supervisor on site–abdicated her responsibilities to him. Specifically, Lt. Carrol states in this report that when she arrived at the scene of the cell extraction and found that he instructions had not been followed she "informed the officers to handle what ever they had started I was not getting involved." (Id.) While Smith ultimately must carry the burden of proof on these factual issues, and must demonstrate that the officers did not use force in a good-faith effort to maintain or restore discipline, but rather applied it maliciously and sadistically to cause harm, Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), this determination is a factual one, which cannot be resolved on summary judgment but rather must await trial. See Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).

Given our finding that disputed facts preclude summary judgment on this particular excessive force claim, we find that the closely related failure to intervene claim lodged against defendant Zemantauski also may not be resolved on summary judgment. As we have noted, to sustain such a claim "the inmate must prove that (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir.2002)." Knauss v. Shannon, CIV. 1:CV-08-1698, 2010 WL 569829 (M.D. Pa. Feb. 12, 2010).

Here, if excessive force was used against Smith on November 21, 2008, then the defendant had a duty to intervene, and the duration of this event, as described by the

parties, would have allowed ample time for intervention. However, a duty to intervene arises only when the officer observes the use of excessive force by fellow staff. Since the current, hotly contested factual record does not permit an assessment as a matter of law concerning whether excessive force was, in fact, used in this case, this factual dispute prevents us from reaching any final conclusions on summary judgment as to this claim against defendant Zemantauski.

We further find that the disputed factual record regarding this incident does not allow us to reach any conclusions regarding whether Lt. Carrol is entitled to judgment in her favor as a matter of law on Smith's excessive force or failure to protect claims. While the current, conflicting factual record suggests that Lt. Carrol's initial instructions regarding how to conduct the cell extraction were disregarded by her subordinates, the lieutenant's apparently admitted to some degree of abdication of her responsibilities on the scene, when she "informed the officers to handle what ever they had started I was not getting involved." In our view Carrol's admitted failure to take command at the scene when she found that her subordinates had ignored her instructions and used force against the plaintiff at a minimum raises a factual question concerning whether this defendant failed to protect Smith from on-going excessive force, and acquiesced in that use of force.

### 2.   <u>Other Excessive Force Claims</u>

Smith has also made separate excessive force claims against defendants Talutto and Moskwa, claiming that they used excessive force when transporting him to medical appointments, and in particular applied handcuffs in a deliberately painful manner during these prisoner transports. In the specific factual context of excessive force claims based upon allegations that a prisoner's handcuffs were too tight, courts have acknowledged that summary judgment is appropriate only "where, 'after resolving all factual disputes in favor of the plaintiff, [ ] the officer's use of force was objectively reasonable under the circumstances.' " <u>Gilles v. Davis</u>, 427 F.3d 197, 207 (3d Cir. 2005). Thus, a defendants' denial of the use of excessive force is not dispositive at this stage. Such a denial does not eliminate a factual dispute. Rather, it defines an essentially factual dispute for resolution at trial.

In this case, after resolving all factual disputes in favor of the plaintiff, we cannot say as a matter of law that the officers' use of force was objectively reasonable under the circumstances. <u>Gilles v. Davis</u>, 427 F.3d 197, 207 (3d Cir. 2005). Indeed, if the disputed facts are all resolved in the plaintiff's favor, then a factfinder could conclude that this use of force was malicious and undertaken for the purpose of inflicting pain.   While we do not opine regarding whether Smith will ultimately be able to carry his burden of persuasion on all of these hotly disputed facts, at this stage our standard of review compels us to resolve these factual disputes in favor of the

plaintiff, and calls upon us to recommend that the court deny summary judgment on these claims.

D.    **Smith Has Stated a Failure to Protect Claim Against Defendants Capone, Blume, Talutto and Mallick**

The defendants have also moved for summary judgment with respect to defendants Capone, Blume, Mallick and Talutto, all of whom are alleged to have harassed Smith by, among other things, openly labeling him to fellow inmates and staff as a child molester and a government grand jury witness when he first arrived at Lackawanna County Prison. Arguing that verbal harassment, standing alone, does not constitute cruel and unusual punishment, DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000), the defendants contend that this conduct does not rise to the level of a constitutional infraction.

To the extent that Smith may be advancing a claim based solely on general allegations of verbal harassment, we agree that he may not maintain a cause of action against these defendants under the Eighth Amendment. However, we construe the plaintiff to be articulating a somewhat different claim, in addition to a general harassment claim. As we understand the allegations in Smith's complaint, it appears that the plaintiff is alleging that the defendants not only verbally harassed him, but also placed his safety in jeopardy by intentionally labeling him as a child molester and a cooperating grand jury witness in the presences of other inmates and staff. To the

extent that Smith can demonstrate that the defendants made deliberate disclosures of this information with the intent to incite inmates to assault Smith, we believe that his complaint may state a claim under the Eighth Amendment.

Under the Eighth Amendment prison officials have a constitutional duty to protect inmates from known harm at the hands of their fellow prisoners. To sustain such a failure-to-protect claim a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Davis v. Williams, 354 F. App'x 603, 605-606 (3d Cir. 2009). Here, as we understand Smith's complaint, the plaintiff alleges that the correctional staff were not merely aware of a risk of harm to him, they created and fostered that risk of harm when they openly identified Smith as a child molester and a cooperating government witness. Furthermore, Smith alleges a causal link between this danger, created by staff's disclosures, and injuries he suffered by asserting that inmates immediately began attempting to harming him because they viewed him as a child molester. In our view, these facts, if proven to a jury's satisfaction, would establish an Eighth Amendment failure to protect claim. Therefore, since we are at this juncture constrained to "consider all evidence in the light most favorable to the party opposing the motion," A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007), we recommend that summary judgment be denied with respects to these particular claims.

**E.**   **With One Exception, Smith's Medical Care Claims Fail**

Smith's complaint also purports to bring a number of Eighth Amendment medical care claims. However, unlike the carefully detailed factual recitals made by Smith in support of his excessive force claims, these claims are articulated with far less clarity and precision. For example, at various points throughout his complaint, Smith makes general and vague complaints regarding the medical care which he received. However, oftentimes these complaints are leveled against unnamed health care providers, and none of the named correctional officer defendants are identified as having any involvement in the medical treatment episodes.

To the extent that Smith advances medical claims of a seemingly generic nature against unnamed health care providers, those allegations fail to state a claim against any of the correctional defendants named in this complaint for at least three reasons:

First, as to the named correctional defendants, for the most part Smith has failed to allege any personal involvement by these defendants in his health care and medical treatment. Since personal involvement in alleged wrongdoing is a prerequisite to civil rights liability in this setting, this particular failure of pleading and proof is fatal to this class of claims set forth in the complaint.

Second, to the extent that Smith is alleging that he was subjected to deliberate indifference by medical staff at the Lackawanna County Prison, the factual recitals set forth by Smith in his complaint, and the medical records attached by the defendants

to their summary judgment motion, affirmatively reveal that Smith received medical and psychiatric care on numerous occasions throughout his six-week confinement in the prison. The nature and extent of this care, which is largely uncontested, thoroughly rebuts any claim of deliberate indifference to the plaintiff's serious medical needs by medical personnel.

Finally, with one exception, the undisputed facts seem to show that these non-medical corrections staff timely referred the plaintiff's medical complaints to medical personnel for their assessment. This is precisely the course of action which the courts have encouraged non-medical staff to follow, and correctional officers may not be held personally liable to referring inmate medical complaints, like those made by Smith, to medical staff for resolution.  See, e.g., Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill v. Gillis, supra; Durmer v. O'Connor, supra; Garvey v. Martinez, No. 08-2217, 2010 WL 569852 (M.D. Pa. Feb. 11, 2010); Hodge v. United States. No. 06-1622, 2007 WL 2571938 (M.D. Pa. Aug. 31, 2007).

While these considerations generally call for dismissal of Smith's Eighth Amendment medical claims against these correctional staff defendants, we note one claim which in our view should survive summary judgment. Smith has alleged that a caustic cleaning substance was sprayed in his eyes on November 20, 2008. According to Smith, defendants Blume, Mallick and Talutto ignored his request for help, and

denied him water to rinse out his eyes, for approximately hour and one-half  hours before transporting to be seen by medical personnel.

We recognize that the defendants vigorously dispute these factual claims in their summary judgment motion, but considering all evidence in the light most favorable to the party opposing the motion,  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007), and understanding that deliberate indifference may be evidenced by delayed provision of medical treatment for non-medical reasons or denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), we find that this specific claim presents disputed, and material, issues of fact which should be resolved at trial. Therefore, summary judgment should not be entered in favor of the defendants on this particular claim.

F.    **Smith's Condition of Confinement Claims Also Fail**

Finally, some of Smith's averments can be liberally construed as raising conditions-of-confinement claims against certain of the correctional defendants. In particular, Smith asserts that defendant Chiarelli ordered a temporary, 12-hour interruption of water service to his cell on November 20, 2008, and further complains that he did not receive adequate bedding, meals and hygiene products for a four-day period from November 26-30, 2008.  With respect to this latter claim, Smith's assertions are cast in general terms. Indeed, Smith only makes two specific allegations

that identify named defendants in this lawsuit. First, Smith states that defendant Mallick failed to deliver a single meal to him during this period. In addition, Smith asserts that when he complained on one occasion to defendant Kearney, the defendant allegedly advised Smith that he would receive nothing while housed in the prison.

These spare assertions do not in our view meet the exacting threshold for an Eighth Amendment conditions of confinement claim. "When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with 'deliberate indifference' to the inmate's health. Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)." Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000). In this setting, it is also clear that: "The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). See Atkinson v. Taylor, 316 F.3d 257, 272 (3d Cir. 2003).

When courts have in the past considered specific conditions of confinement alleged by inmates under this Eighth Amendment standard, it is apparent that many of the complaints advanced by Smith have been found not to "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337,

347(1981). For example, "[p]ursuant to the case law related to the denial of bedding, the denial of [an inmate's] mattress for a short period of time does not rise to the level of a constitutional violation." Milhouse v. Gee, No. 09-2134, 2011 WL 3627414, *13 (M.D.Pa. Aug. 17, 2011) citing Lane v. Culp, Civ. No. 05–576, 2007 WL 954101 (W.D.Pa. Mar.28, 2007) (holding that denial of clothing and bedding for period of seven days does not rise to level of constitutional violation); Castro v. Chesney, Civ. No. 97–4983, 1998 WL 767467 (E.D.Pa. Nov. 3, 1998) ("Plaintiff's allegation that he was deprived of a mattress and blanket for a period of two days, even if proved, would not rise to the level of a constitutional violation."); Stephens v. Cottey, 145 F. App'x 179, 181 (7th Cir. Aug.11, 2005) (holding no Eighth Amendment violation exists where prisoner spent three days without a mattress sleeping on a metal bedframe and five days with no bedframe sleeping on the floor).

Similarly, courts have frequently rebuffed inmate complaints like those made here relating to the packaging and presentation of meals. Thus, "while prisoners are guaranteed a nutritionally adequate diet under the Eighth Amendment, see Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir.1980), there is no constitutional right to hot meals. See Brown-El v. Delo, 969 F.2d 644, 648 (8th Cir.1992) (finding frivolous prisoner's claim that his constitutional rights were violated when he was served cold food)." Laufgas v. Speziale, 263 F.App'x. 192, 198 (3d Cir. 2008). Similarly, the "purported deprivation of a single meal is not of such magnitude as to rise to the level of a

constitutional violation. <u>See Robles v. Coughlin</u>, 725 F.2d 12, 15 (2d Cir.1983) (only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim)." <u>Lindsey v. O'Connor</u>, 327 F.App'x. 319, 321 (3d Cir. 2009). Furthermore, court have held that a brief interruption in water service to an inmate's cell does not, by itself, so deprive an inmate of "the minimal civilized measure of life's necessities." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347(1981)**,** that it constitutes an violation of the Eighth Amendment. <u>Banks v. Mozingo</u>, 423 F. App'x 123, 127-28 (3d Cir. 2011), citing <u>Williams v.Delo</u>, 49 F.3d 442, 444–47 (8th Cir.1995) (finding no Eighth Amendment violation where prisoner was placed in a strip cell without clothes, the water in the cell was turned off and the mattress removed, and prisoner's bedding, clothing, legal mail, and hygienic supplies were withheld).

Finally, courts have repeatedly held that inmate Eighth Amendment claims, like those made here, which rest upon a brief alleged failure to provide personal hygiene supplies to a prisoner do not state a claim under the Eighth Amendment. <u>See e.g.,Banks v. Mozingo</u>, 423 F.App'x 123 (3d Cir. 2011)(denying inmate hygiene complaint as ironic where inmate engaged in un-hygienic behavior, including smearing feces on cell); <u>Adderly v. Ferrier</u>, 419 F.App'x 135 (3d Cir. 2011)(denying inmate claim involving 7 day alleged denial of hygienic material); <u>Fortune v. Hamberger</u>, 379 F.App'x 116 (3d Cir. 2010)( denying inmate claim involving 15 day alleged denial of hygienic material); <u>Benjamin v. Fraser</u>, 161 F.Supp.2d 151, 177

(S.D.N.Y.2001) (two days without feminine hygiene products and toilet paper did not

establish a constitutional violation); Stead v. Skinner, 10-4526, 2011 WL 3882809,

*4 (N.D.Ill., Sept 2, 2011).

Thus, to the extent that Smith lodges specific condition of confinement claims

against three individual defendants–defendants Chiarelli, Kearney and Mallick–those

claims all relate to matters which do not rise to the level of a deprivation of "the

minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337,

347 (1981). Therefore, these particular Eighth Amendment claims fail as a matter of

law, and it is recommended that these claims be dismissed. Since defendants Chiarelli

and Kearney are named only in connection with these conditions of confinement

claims, it is further recommended that these defendants also be dismissed from this

lawsuit.

### G.     Smith's Inmate Disciplinary Hearing/Due Process Claim Should Be Dismissed

In addition, to his Eighth Amendment claims, Smith has brought a due process

claim against two defendants, defendants Maloney and Hebron, arising out of their

involvement in a disciplinary hearing relating to Mr. Smith. While the conduct of that

hearing is hotly contested by the parties, what seems undisputed in this case is that the

hearing did not result in any sanction which prolonged or extended Smith's

incarceration. Instead, the sole sanction imposed here, 100 days of disciplinary

custody, was a sanction which related solely to the  incidents of prison life for the plaintiff while he was housed at the Lackawanna County Prison.

In analyzing any procedural due process claim of this type, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Fuentes v. Shevin, 407 U.S. 67 (1972)).  Once we determine that a property or liberty interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  Protected liberty or property interests generally arise either from the Due Process Clause or from some state-created statutory entitlement. See Board of Regents v. Roth, 408 U.S. 564, 575 (1972).

However, in the case of prison inmates:

[i]n Sandin v. Conner, the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees.  Although the Court acknowledged that liberty interests could arise from means other than the Due Process Clause itself, the Court concluded that state-created liberty interests could arise only when a prison's action imposed an '*atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*' . . . In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Court considered the following two factors: 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.

Shoats, 213 F.3d at 143-44(citations omitted, emphasis added).

Applying these legal benchmarks, it has been held that disciplinary proceedings which result in sanctions of disciplinary segregation for six months or more do not impose atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life in similar situations, and do not give rise to due process claims. See e.g., Crosby v. Piazza, No. 11-1176, 2012 WL 641938 (3d Cir. Feb, 29, 2012)(270 days of disciplinary segregation);Foster v. Sec'y, PA Dept. of Corr., 431 F. App'x 63, 65 (3d Cir. 2011)(held, "transfer to a restricted housing unit was not an atypical or significant hardship or a severe change in the conditions of his confinement" triggering due process protections); Milton v. Ray, 301 F.App'x 130 (3d Cir. 2008); Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (7 months disciplinary confinement).

Thus, in this case, entirely aside from the factual disputes between the parties regarding the degree of due process protection afforded to Smith at this hearing, it is undisputed that the sole sanction imposed against the plaintiff was 100 days of disciplinary custody. Since this sanction, standing alone, does not entail an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life, the penalty imposed here does not implicate a liberty interest which triggers due process protection under the Fourteenth Amendment in this correctional setting.

Accordingly, Smith's claims against defendants Maloney and Hebron should be dismissed.

### H.     Warden Donate Should be Dismissed From This Lawsuit

While disputed factual issues preclude summary judgment as to some of the correctional defendants who were directly involved in various confrontations with Smith, Smith's claims as to Warden Donate stand in a different legal footing. As to Warden Donate, Smith's claims are succinctly stated by the plaintiff in the following terms:

> Defendant Janine Donate is the Warden of the Lackawanna County Prison. She is legally responsible for the daily operation of the Lackawanna County Prison and for the welfare of all the inmates of that prison.

(Doc. 1, ¶207.)

Thus, Smith's complaint specifically conditions Warden Donate's liability on her supervisory status without any well-pleaded allegation of her direct involvement in specific acts of misconduct. This he cannot do. The principles which govern supervisory liability in civil rights cases are clearly defined. At the outset, it is clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him

of a right secured by the Constitution.  Morse v. Lower Merion School Dist., 132 F.3d

902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980). Constitutional tort

liability is personal in nature and can only follow personal involvement in the alleged

wrongful conduct shown through specific allegations of personal direction or of actual

knowledge and acquiescence in the challenged practice.  Robinson v. City of

Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability

is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution

<u>Ashcroft v. Iqbal</u>,  129 S.Ct. 1937, 1948 (2009).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. <u>O'Connell v. Sobina</u>, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); <u>Neuburger v. Thompson</u>, 305 F. Supp. 2d 521, 535 (W.D. Pa. 2004). Rather, "[p]ersonal involvement must be alleged and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them. <u>See Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.1988)." <u>Jetter v. Beard</u>, 183 F. App'x 178, 181 (3d Cir. 2006).

In this case, Smith has listed Warden Donate in his complaint as a defendant, but the complaint contains no factual averments regarding this supervisory official's direct involvement or acquiescence in the events set forth in the complaint beyond a reference to her supervisory status. This is a style of pleading which is plainly inadequate to state a claim against a prison supervisor and compels dismissal of this defendant. <u>Hudson v. City of McKeesport</u>, 241 F. App'x 519 (3d Cir. 2007)(affirming dismissal of defendant who was only named in caption of case). Therefore, Warden Donate should be dismissed from this case.

**III**.   <u>**Recommendation**</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' Motion for Summary Judgment (Doc. 102), be GRANTED in part, and DENIED in part, as follows:

1.   The District Court Should GRANT summary judgment in favor of defendants Donate, Maloney, Hebron, Kearney, and Chiarelli.

2.    The District Court Should GRANT summary judgment in favor of the remaining defendants on Smith's conditions of confinement claims.

3.   The District Court Should GRANT summary judgment in favor of the remaining defendants on Smith's medical deliberate neglect claims, with the exception of Smith's claim that a caustic cleaning substance was sprayed in his eyes on November 20, 2008, and defendants Blume, Mallick and Talutto ignored his request for help, and denied him water to rinse out his eyes, for approximately four and one half  hours before transporting Smith to be seen by medical personnel.

4.   The District Court Should GRANT summary judgment in favor of the remaining defendants on Smith's claims which relate solely to alleged verbal harassment.

5.   The District Court should DENY summary judgment on the remaining excessive force, medical deliberate indifference, and failure to protect

Case 4:10-cv-02133-MEM   Document 150   Filed 06/15/12   Page 48 of 48

claims lodged by Smith against defendants Carrol, Shanley, Blume,

Mallick, Zemantauski, Moskwa, Talutto and Capone.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 15th day of June, 2012.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

-48-